UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                         :

GEORGE LEE,                      :
                          :
                  Plaintiff,    :

|  | |
|---|---|
| | **14 Civ. 5278 (KPF)** |

                    v.          :         <u>OPINION AND ORDER</u>
                          :

STARWOOD HOTELS & RESORTS
WORLDWIDE, INC.,         :
                          :
                Defendant. :
                          :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Plaintiff George Lee filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, alleging employment discrimination and retaliation based on his national origin. Defendant Starwood Hotels & Resorts Worldwide, Inc., who continues to employ Lee at one of its hotels, has moved for summary judgment on all of Plaintiff's claims. For the reasons set forth in this Opinion, Defendant's motion is granted.

<h2 style="text-align:center">BACKGROUND[1]</h2>

## A.    Factual Background

      Plaintiff George Lee is a man of Jamaican national origin who works as a house attendant at the Westin New York at Times Square (the "Hotel" or the

---

[1]    The facts stated herein are drawn from the Complaint ("Compl.," Dkt. #1); Plaintiff's letter of February 6, 2015, containing additional factual allegations ("Feb. 2015 Letter," Dkt. #22); the parties' submissions in connection with the instant motion, including Defendant's Local Rule 56.1 Statement ("Def. 56.1," Dkt. #56), and Plaintiff's responses thereto ("Pl. 56.1 Opp," Dkt. #66); the exhibits attached to the Declaration of Nicholas A. Duston ("Duston Decl.," Dkt. #59), including the transcript of Plaintiff's deposition ("Lee Dep."); and the declarations submitted with Defendant's papers (cited using the

"Westin"), owned by Defendant Starwood Hotels & Resorts Worldwide, Inc. ("Starwood" or "Defendant").  (Def. 56.1 ¶¶ 1-2).  Plaintiff was initially hired by Defendant in 2003, and, on the record before the Court, remains employed at the Westin.  (*Id.* at ¶¶ 2, 12).

### 1.    The House Attendant Position at the Westin

Working as a house attendant for the Westin can involve a number of different roles, with corresponding work duties:  (i) a "floor house attendant" is assigned to specific floors of the Hotel, and brings anything needed by guests or room attendants (who clean guest rooms) to those floors; (ii) a "project house attendant" undertakes projects around the Hotel as needed, such as cleaning floors, moving furniture, or unloading supplies into storage rooms; and (iii) a "runner" brings needed items to guest rooms during hours when no floor house attendants are working.  (Def. 56.1 ¶¶ 26-29).

Further, these roles may correspond to specific work hours; for example, floor house attendants necessarily work the same hours as room attendants:

---

convention "[Name] Decl.").  Page cites to the Complaint and to the exhibits use the page numbers provided by the Court's electronic case filing ("ECF") system, unless otherwise indicated.  For ease of reference, Defendant's opening brief is referred to as "Def. Br." (Dkt. #58), Plaintiff's response in opposition is referred to as "Pl. Opp." (Dkt. #66), and Defendant's reply brief as "Def. Reply" (Dkt. #69).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

specifically, from 9:00 a.m. to 4:30 p.m. on Monday[2] to Friday; from 9:30 a.m. to 5:00 p.m. on Saturday; and from 10:00 a.m. to 5:30 p.m. on Sunday.  (Def. 56.1 ¶ 27).  In contrast, runners and project house attendants need not work alongside room attendants, and may be scheduled to begin work as early as 7:00 a.m.  (*Id.* at ¶ 30).  Moreover, a house attendant might work more than one of these positions during various times of the same shift; Plaintiff, for example, works on weekdays as a runner from 7:00 a.m. to 9:00 a.m., and then as a project house attendant from 9:00 a.m. to 2:30 p.m.  (*Id.* at ¶ 31).

### 2.    The Sign-Up Process for House Attendant Shifts

The house attendant is a union position, governed by a collective bargaining agreement (the "CBA") with the New York Hotel and Motel Trades Council, Local 6.  (Def. 56.1 ¶ 3).  Under the CBA, the Hotel may add or reduce shifts based on operational needs or economic conditions.  (*Id.* at ¶ 20; *see also* Pl. 56.1 Opp. ¶ 20 (noting that the Hotel must still observe seniority criteria)).  Defendant states that employee shift assignments comprise both a particular work duty and a time schedule, and may sometimes include assignment of specific days off.  (Def. 56.1 ¶ 23).[3]  Employees' schedules are determined by seniority within their departments, though Plaintiff disputes that this system was always followed.  (*Id.* at ¶¶ 21-22; Pl. 56.1 Opp. ¶ 22).

---

[2]    While Defendant's Rule 56.1 Statement and the Declaration of Georgina Anoff describe these as Wednesday-to-Friday hours (*see* Def. 56.1 ¶ 27; Anoff Decl. ¶ 7), Plaintiff stated during his deposition that these were Monday-to-Friday hours (Lee Dep. 49). This factual dispute does not impact the Court's resolution of the instant motion.

[3]    Plaintiff contends that postings typically did not include hours and days off.  (Pl. 56.1 Opp. ¶ 23).  For reasons discussed later in this Opinion, the Court ultimately determines that this fact is not material.

When a shift becomes available, any house attendant may sign up for it; when the "posting period" has elapsed, the shift is awarded to the most senior house attendant who signed up, after review by management and a union delegate. (Def. 56.1 ¶ 24). The house attendant who takes over that shift then switches to the posted shift's work duties, time schedule, and, if specified, days off. (*Id.* at ¶ 25).

### 3. Plaintiff's and Ferdinand Kwashie's Assignments to the 7:00 a.m. House Attendant Shift

From April 2012 until the present, Plaintiff has worked the 7:00 a.m. to 2:30 p.m. house attendant shift. (Def. 56.1 ¶ 37).[4] Prior to April 2012, Daniel Mensah, then the most senior house attendant, held this position. (*Id.* at ¶ 41). However, when Mensah was placed on suspension for six to eight weeks pending an investigation, Ferdinand Kwashie, originally from Ghana, became the most senior house attendant and temporarily assumed Mensah's role and shift. (*Id.* at ¶¶ 41, 43).

In or about May 2012, Mensah was terminated, and Kwashie became the most senior house attendant. (Def. 56.1 ¶ 44). The 7:00 a.m. shift was posted at that time to be filled on a permanent basis, but Kwashie failed to sign up for the shift, and it was awarded to Plaintiff as the most senior applicant. (*Id.* at ¶¶ 45, 47-48). Upon the assignment to Plaintiff, Kwashie complained, contending that he should have been awarded the shift without signing up, by

---

[4]     As noted above, the house attendant assigned to the 7:00 a.m. shift works as a runner from 7:00 a.m. to 9:00 a.m. and a project house attendant from 9:00 a.m. to 2:30 p.m. (Def. 56.1 ¶ 42). When Plaintiff signed up for this shift, the posting specifically listed this time schedule and this division in work duties. (*Id.* at ¶ 32).

virtue of his seniority and his temporary assumption of the assignment.  (*Id.* at ¶¶ 48-49).  Plaintiff does not dispute that had Kwashie signed up for the shift, it would have been awarded to him.  (*Id.* at ¶ 50).

While Plaintiff typically would have begun working this 7:00 a.m. schedule the following week, the Hotel's then-Director of Housekeeping, David Markland, instructed Georgina Anoff, the Assistant Director of Housekeeping, to delay starting Plaintiff on the 7:00 a.m. schedule until Kwashie's complaint was resolved.  (Def. 56.1 ¶ 51).  Anoff, who, like Kwashie, is from Ghana, responded that Plaintiff should be given the shift because he was the most senior house attendant to sign up, but kept Plaintiff on the 9:00 a.m. shift per Markland's instruction.  (*Id.* at ¶ 52).

In June 2012, Markland met with Plaintiff's union delegates, Papa Yaw and Mohamed Mutawalkil.[5]  (Def. 56.1 ¶ 53).  After this meeting and after further discussion with Anoff, Markland determined that Plaintiff appropriately was awarded the shift; he therefore instructed Anoff to place Plaintiff on the 7:00 a.m. shift and Kwashie on his previous 9:00 a.m. shift.  (*Id.* at ¶¶ 53-54).  Consequently, Kwashie submitted a grievance, and Markland again met with Anoff to discuss the prospect of placing two house attendants on the 7:00 a.m. shift.  (*Id.* at ¶¶ 55-56).  This was the extent of Anoff's involvement in decisions regarding the 7:00 a.m. shift.  (*Id.* at ¶ 56).

---

[5]     The Court notes that Mutawalkil's name is alternately spelled as "Mutawakil" and "Mutawalkili," but adopts the spelling immediately underneath the signature line of his declaration.  (*See* Dkt. #63).

In August 2012, Markland met with Anne Powell, the Hotel's then-Acting Human Resources Director, and Ello Saunders, a union delegate, to discuss the shift assignment issues; ultimately, Markland decided to add a second position to the 7:00 a.m. shift for Kwashie. (Def. 56.1 ¶ 57).[6] Anoff, in turn, instructed Kathryn Redden, the Housekeeping Manager and Scheduler, to schedule both Plaintiff and Kwashie to work the 7:00 a.m. shift. (*Id.* at ¶ 64). At that time, Plaintiff's union delegates informed him that Kwashie had been added to the shift, and Markland informed Plaintiff that this was not Anoff's decision. (*Id.* at ¶¶ 60, 65).

Ultimately, Kwashie was assigned to the 7:00 a.m. shift, alongside Plaintiff, because (i) it resolved Kwashie's continuing grievance over the shift assignment, and (ii) it was in the "best business interests" of the Hotel to have two house attendants working the 7:00 a.m. shift. (Def. 56.1 ¶ 59).[7] Following Kwashie's assignment to the shift, Plaintiff complained about the division of labor, and Markland and others attempted to clarify their respective roles; Plaintiff then worked as a runner from 7:00 a.m. to 9:00 a.m., while Kwashie worked as a project house attendant. (*Id.* at ¶ 66). Plaintiff and Kwashie have both worked the 7:00 a.m. shift since August 2012. (*Id.* at ¶ 67; *see also* Lee Dep. 242-46).

---

[6]    Markland, Powell, and Saunders are not from Ghana. (Def. 56.1 ¶ 58).

[7]    The Hotel did not formally post this opening for a second house attendant, as Kwashie was the most senior house attendant in the department and would unquestionably have been awarded the shift. (Def. 56.1 ¶ 63). Further, because the position had been awarded to Kwashie in order to resolve his union grievance, rather than in the ordinary course, it was not necessary to post it. (Markland Decl. ¶ 22).

### 4.    Plaintiff's Overtime Work

While the Westin does not guarantee overtime work, any necessary overtime hours are assigned by "shift seniority" and given to the most senior employee working a particular shift; if that employee turns down the overtime work, it will be offered to a less senior employee.  (Def. 56.1 ¶¶ 33-35). Because overtime is not assigned based on seniority *across* shifts, but only within them, a shift that begins at 7:00 a.m. might have more opportunity for overtime than a 9:00 a.m. shift, as the 7:00 a.m. employee finishes his or her "regular" hours earlier and may be asked to stay to work additional time.  (*Id.* at ¶ 36).  As Plaintiff explained:

> [Y]ou can make a lot of overtime on the [7:00 a.m.] shift … [b]ecause … when you finish working at 2:30, the [other] housemen are still working to 4:30 and the room attendants are still there.  So they always need the assignment of work to be finished up … so … you can make maybe like an extra two hours [or] come the weekend … three hours [of overtime pay per day].

(*Id.* at ¶ 69).  According to hotel records, Plaintiff earned a total of 121.8 hours of overtime pay from June to July 2012 on the 7:00 a.m. shift, a time period during which "all house attendants, including [Plaintiff], worked significantly higher than normal amounts of overtime." (*Id.* at ¶¶ 72-73).

For the period from August 2012, when Kwashie was assigned to the second 7:00 a.m. shift, until July 1, 2014, when Plaintiff filed the instant Complaint, (i) Plaintiff earned 384.74 overtime hours, more than any other employee in the Housekeeping Department; (ii) the second-highest earner of the department earned 265.47 overtime hours; and (iii) Kwashie, the sixth-highest

7

earner, earned 209.97 overtime hours.  (Def. 56.1 ¶¶ 75, 77).[8]  During those 24 pay periods, Plaintiff earned more overtime than Kwashie for 16 pay periods, Kwashie earned more overtime than Plaintiff for seven pay periods, and the two earned equal overtime for one pay period.  (*Id.* at ¶ 78).  Additionally, Plaintiff was on leave from September 22, 2012, through November 26, 2012, during which time he could not earn overtime.  (*Id.* at ¶ 79).

### 5.    Plaintiff's Attempts to Sign Up for Other Shifts

In July and August 2013, the Westin posted a number of shift sign-up sheets, on some of which Plaintiff listed his name.  (Def. 56.1 ¶¶ 81, 84).  All of these positions represented different shift assignments for the same floor house attendant position in which Plaintiff already worked, with the same rate of pay. (*Id.* at ¶ 82).  Ultimately, each of these positions was assigned to an employee other than Plaintiff, in accordance with the seniority procedures described above.  (*Id.* at ¶ 83).

When several of these sign-up sheets were initially posted on July 17, 2013, union delegate Mohamed Mutawalkil noted that they lacked specificity regarding shift start- and end-times; thus, he requested that the director of housekeeping, Elvir Dervisevic, amend them to add all relevant facts about the shifts, similar to the level of detail offered in the past.  (Def. 56.1 ¶¶ 85-86). Accordingly, the sign-up sheets were replaced the following day, on July 18, 2013.  (*Id.* at ¶ 87).

---

[8]     During this time, Kwashie was the most senior house attendant, and Lee was the seventh-most-senior house attendant.  (Def. 56.1 ¶ 76).

The floor house attendant positions cited by Plaintiff that were ultimately awarded to others include the following:

- The Hotel posted for one shift on July 17, 2013, and reposted the position the following day to include start and end times. Plaintiff requested to be assigned to the shift's work duty while maintaining his 7:00 a.m. to 2:30 p.m. schedule, but Mutawalkil, Dervisevic, and Kevin Ruck (Assistant Director of Housekeeping) informed Plaintiff that the post would require a switch in his hours. (Def. 56.1 ¶¶ 88-89; *see also* Welch Decl. Ex. C at 2, Ex. D at 2). As noted above, because floor house attendants necessarily work only when room attendants work, the position had a start time coinciding with the beginning of the room attendants' work day. (Def. 56.1 ¶ 90). That position was ultimately awarded to Manuel Aldover, who was more senior than Plaintiff. (*Id.* at ¶ 91).[9]

- The Hotel posted for another shift on July 17, 2013, and reposted it the following day for the same reasons. Oral Rodney, who is senior to Plaintiff, was ultimately awarded the shift. Plaintiff's name does not appear on these sign-up sheets. (Def. 56.1 ¶ 92; *see also* Welch Decl. Ex. C at 3, Ex. D at 3).

- Two other shifts for which Plaintiff did not list his name were ultimately awarded to the most senior house attendants who did sign up, though these individuals were less senior than Plaintiff. (Welch Decl. Ex. C at 4-5; Def. 56.1 ¶ 93).

- Finally, a shift was posted on August 3, 2013, and Plaintiff again attempted to sign up for the shift while retaining his current hours. (Welch Ex. D at 5; Def. 56.1 ¶ 94). Mutawalkil, Dervisevic, and Ruck informed Plaintiff that he would be required to change his work hours for the assignment, which Plaintiff did not wish to do; the shift was ultimately awarded to the most

---

[9]    Aldover was on Family and Medical Leave Act ("FMLA") leave at the time of the assignment, but was called and offered the open position, as is typical practice. (Def. 56.1 ¶ 91).

senior house attendant who was willing to accept the duties and assigned hours.  (Def. 56.1 ¶ 94).

### 6.   Plaintiff's Ongoing Employment at the Westin

Since the filing of his Complaint, the only disciplinary actions against Plaintiff have been three written warnings precipitated by late arrivals to work, on days when Plaintiff admits he was late.  (Def. 56.1 ¶ 14).  Otherwise, Plaintiff has received raises since filing the Complaint.  (*Id.* at ¶ 13).  While Plaintiff has had social conversations with coworkers about his and others' national origins, no one has made negative comments about Plaintiff's national origin or Jamaicans in general; further, no one specifically referenced in Plaintiff's Complaint has said anything at all about Plaintiff's national origin or Jamaicans in general.  (*Id.* at ¶¶ 17-19).

## B.   Procedural Background

On January 17, 2014, Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission (the "EEOC"), alleging employment discrimination based on his race and national origin, and retaliation.  (Compl. 6-10).  On March 31, 2014, the EEOC dismissed Plaintiff's claim and issued a Notice of Right to Sue letter.  (*Id.* at 5).  On July 1, 2014, Plaintiff initiated this action, *pro se*, claiming Defendant had violated his rights under Title VII.  (*Id.* at 1-12).  Then, on February 6, 2015, Plaintiff filed a letter with the Court containing additional allegations.  (Feb. 2015 Letter).

On November 5, 2015, Defendant filed the instant motion for summary judgment.  (Dkt. #47-63).  Plaintiff filed his opposition papers on January 4,

2016 (Dkt. #66), and briefing was completed with the filing of Defendant's reply papers on January 22, 2016 (Dkt. #69).

The Court notes that Plaintiff's opposition consists, in all, of three pages of writing disputing Defendant's 56.1 statement, a printout of Federal Rule of Civil Procedure 56 and Local Civil Rules 56.1 and 56.2, a document titled "STAFF MEMBERS OF AFRICAN WITH WESTIN @ TIMES SQUARE NEW YORK BENEFICIALS CONTRIBUTIONS," and a weekly schedule of house attendants from the Westin.  While Plaintiff did not submit additional arguments, the Court will nonetheless proceed on his current submission.

The Court previously granted Plaintiff an extension of time to file his opposition (Dkt. #64-65), and informed him during the pre-motion conference on August 19, 2015, that he must "tell [the Court] why the facts [in the 56.1 Statement] are disputed and what [he] think[s] the facts are.  And if [he] disagree[s] with the way [Defendant is] citing these cases ... let [the Court] know.... [Defendant is] going to tell [the Court], [ ] why they think [his] claims should be dismissed, and [Plaintiff should] tell [the Court] why they're wrong." (Dkt. #42 at 19-20).  Further, with its motion, Defendant supplied Plaintiff with the text of Federal Rule of Civil Procedure 56 and Local Civil Rules 56.1 and 56.2, which informed Plaintiff that he "must submit evidence ... countering the facts asserted by the defendant and raising specific facts that support your claim." (Local Civ. R. 56.2).

In light of the efforts made by the Court and Defendant to inform Plaintiff of his obligations under Rule 56, the Court will consider Plaintiff's current

11

submission on its merits.  Still, given the leniency shown to *pro se* parties, the Court will consider as well statements made by Plaintiff at his deposition to the extent they illuminate the contentions in his Complaint and February 2015 Letter.

**DISCUSSION**

**A.    Applicable Law**

      **1.    Summary Judgment Motions Generally**

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *accord Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding

12

summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342

13

(S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

### 2.     Summary Judgment Motions Involving *Pro Se* Plaintiffs

In a *pro se* case, the court must take an additional step and liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).[10]

*Pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009). Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments." *Id.* (citing *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *County of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record."). As noted, the Court has done that here. In addition, as to those facts for which Plaintiff

---

[10]     Further, "[i]f the moving party seeks summary judgment against a *pro se* litigant, the moving party is also required to notify the *pro se* litigant of the requirements of Rule 56 and Local Civil Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing Local Civ. R. 56.2).  Defendant has done that here.

has provided opposition comporting with Local Rule 56.1, the Court will address Plaintiff's responses.

### 3.    Summary Judgment Motions in Discrimination Cases

In discrimination cases, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer* v. *Norden Sys.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations and footnote omitted).  "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).  In other words, a plaintiff "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys*, 426 F.3d at 554 (internal citation and quotation marks omitted); *see also Bickerstaff* v. *Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (cautioning courts to "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture").  The ultimate test for summary judgment in discrimination cases remains "whether the evidence can reasonably support a verdict in plaintiff's favor."  *James* v. *N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

### 4. Evaluating Discrimination Claims Under Title VII

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Employment discrimination claims under Title VII are analyzed using the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 (1973). *See, e.g., Brown* v. *City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).

At the first step of the *McDonnell Douglas* analysis, a plaintiff must present evidence supporting a *prima facie* case of discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 802. To meet this burden, a plaintiff must show that: (i) he belongs to a protected class; (ii) he was qualified for the position at issue; (iii) he suffered an adverse employment action; and (iv) that action occurred under circumstances giving rise to an inference of discrimination. *See id.*; *Holcomb*, 521 F.3d at 138. The Second Circuit has emphasized that the "burden of establishing a *prima facie* case is *de minimis.*" *Abdu-Brisson* v. *Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir. 2001).

If a plaintiff successfully presents a *prima facie* case of discrimination, this shifts the burden to the defendant to proffer legitimate, nondiscriminatory reasons for the adverse employment action. *Abdu-Brisson,* 239 F.3d at 466, 468-69. The defendant's burden at this stage is also "light." *Greenway* v. *Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir. 1998).

At the third step of the *McDonnell Douglas* framework, the burden shifts back to the plaintiff to prove intentional discrimination by a preponderance of the evidence.  *See Holcomb*, 521 F.3d at 138; *Fields* v. *N.Y. State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 121 (2d Cir. 1997).  The plaintiff may satisfy this "either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions."  *Gordon* v. *N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000) (quoting *Fields,* 115 F.3d at 121); *see also Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

### 5.    Evaluating Retaliation Claims Under Title VII

Retaliation claims under Title VII are also subject to the *McDonnell Douglas* burden shifting framework.  *See Fincher* v. *Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).  The plaintiff must first establish a *prima facie* case that his employer retaliated against him, demonstrating that "[i] he engaged in a protected activity by opposing a practice made unlawful by Title VII; [ii] his employer was aware of that activity; [iii] he suffered a materially adverse employment action; and [iv] there was a causal connection between the protected activity and the adverse employment action."  *Giscombe* v. *N.Y.C. Dept. of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014).  If the plaintiff succeeds in establishing a *prima facie* case of retaliation, creating a presumption that his employer retaliated against him, the employer must "produc[e] evidence that the adverse employment actions were taken for a

17

legitimate, non-retaliatory reason." *Giscombe*, 39 F. Supp. 3d at 400 (internal quotation marks and alterations omitted).  Should the employer rebut this presumption, the plaintiff must prove that the employer's proffered reason "was not the true reason for the employment decision," and must establish facts "to support a rational finding that the legitimate reasons proffered by the defendant were false and that more likely than not retaliation was the real reason for the employment action." *Id.* (internal citation and quotation marks omitted); *see generally Zann Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

**B.     Analysis**

> **1.     Defendant Is Entitled to Summary Judgment on Plaintiff's Employment Discrimination Claim**

Defendant persuasively argues that Plaintiff has failed to meet his burden of demonstrating a *prima facie* case under Title VII; in particular, Plaintiff has not presented evidence that he suffered any adverse employment action, either on his discrimination claim or on his retaliation claim.  However, even if the Court were to presume an adverse employment action, Plaintiff presents no evidence to carry his burden, limited though it is, of showing that such actions occurred under circumstances giving rise to an inference of discrimination.

> **a.     Plaintiff's Claim Regarding Delayed Transfer to the 7:00 a.m. Shift Fails**

First, Plaintiff argues that after he was awarded the 7:00 a.m. position, Anoff chose to delay Plaintiff's starting on that schedule by almost six weeks,

requiring him to continue working his old schedule in the interim; during that time, Kwashie, "who is from African descent (Ghana) the same as Georgina Anoff," was working the 7:00 a.m. shift and earning overtime. (Compl. 9; *see also* Feb. 2015 Letter ¶¶ D, E). In his February 26, 2015 letter alleging additional facts, Plaintiff states, "[n]ormally when the position is given to a member[,] the job and the schedule is given the following week." (Feb. 2015 Letter ¶ C). Plaintiff suggests Anoff intentionally delayed his start date, and claims the Director of Housekeeping, David Markland, was not aware that Plaintiff had failed to receive his new schedule; following a meeting of Markland and Plaintiff's union delegates, Plaintiff received his new schedule in June 2012, and Kwashie was switched to the 9:00 a.m. schedule. (Compl. 9; Feb. 2015 Letter ¶¶ F, G).

This delay in switching Plaintiff to his new work schedule does not rise to the level of an adverse employment action. The Second Circuit has previously found that no adverse employment action occurred where a teacher's reassignment was delayed by four months, far exceeding the six weeks here, given that the teacher failed to show that (i) he was denied an available transfer, (ii) he did not receive a salary during the delay, or (iii) the delay harmed his career. *Galabya* v. *N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640-41 (2d Cir. 2000); *see also Warren* v. *North Shore Univ. Hosp. at Forest Hills*, 268 F. App'x 95, 98 (2d Cir. 2008) (summary order) (delay in plaintiff's transfer between hospital departments and delay in shift assignments did not constitute adverse employment actions under Title VII). An adverse

19

employment action is a "material adverse change in the terms and conditions of employment," which "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640.  Employment actions "deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices … unique to a particular situation." *Williams* v. *R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004); *see generally Brown*, 673 F.3d at 150.

Plaintiff presents no evidence that he failed to receive a salary during this delay or that it harmed his career, as he indeed was transferred to the shift six weeks after the sign-up was posted.  While Plaintiff might argue that he was denied an available transfer in that interim period, the evidence demonstrates that the delay was occasioned by the attempted resolution of Kwashie's union grievance, and thus, the position was not made available until the proper assignment was resolved.  (*See* Markland Decl. ¶¶ 11-13 ("Although a newly-bid schedule would ordinarily have been given to [Plaintiff] on the next posted schedule, I instructed Georgina Anoff, assistant director of housekeeping … not to immediately put [Plaintiff] on the 7:00 a.m. Shift until the [disputed assignment] was resolved.  In or about June 2012, I met with [Plaintiff's] union delegates….  After meeting with [them], and discussing the Shift posting with Anoff, in or about June 2012, I instructed Anoff to place [Plaintiff] on the 7:00 a.m. Shift.")).  This "relatively minor administrative miscue[] that occurred

20

during the reassignment process is not cognizable as an adverse employment action." *Galabya*, 202 F.3d at 640.

However, even if this delay were deemed denial of an available transfer, and thus could be construed as an adverse employment action, Plaintiff fails to provide any evidence that this action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802. While Plaintiff claims in his Complaint and his February 2015 Letter that Anoff ordered the delay in his transfer (Compl. 9; Feb. 2015 Letter ¶¶ D, E), the evidence adduced during discovery makes plain that the deferment of Plaintiff's transfer was decided by Markman, and that Anoff's role was limited to carrying out Markman's orders (Markman Decl. ¶¶ 11-13; Anoff Decl. ¶¶ 21-23). Plaintiff has failed to present any evidence supporting an inference that Anoff personally determined to keep him from starting his new shift — much less that she did so for reasons relating to his national origin — and thus, he has failed to establish a *prima facie* case of discrimination.

Still further, if Plaintiff's claims were deemed a *prima facie* case, Defendant has succeeded in proffering nondiscriminatory reasons for delaying Plaintiff's transfer, as to which Plaintiff has failed to raise a genuine issue of material fact. The Court would be required both to disregard a wealth of uncontested evidence and to resort to impermissible speculation in order to find Defendant's articulated reasoning — the attempted resolution of Kwashie's union grievance — to be a pretext, given that Plaintiff has offered no evidence countering this contention. Accordingly, no reasonable juror could find that

the delay in Plaintiff's transfer, precipitated by efforts to resolve another employee's grievance proceeding seeking assignment to the same position, was the result of intentional discrimination.

> **b.   Plaintiff's Claim Regarding the Addition of Kwashie to the 7:00 a.m. Shift and the Resultant Allocation of Overtime Fails**

Plaintiff further alleges that Kwashie was placed on the 7:00 a.m. shift through improper procedures and favoritism by Anoff, resulting in a reduction in Plaintiff's overtime potential; from June 2012 until August 2012, when "Anoff decided to put [Kwashie] on the same shift," Plaintiff earned "a lot of overtime." (Compl. 9).  Plaintiff claims that since 2003, only one employee had worked the 7:00 a.m. shift, which averaged almost 11 hours per week of overtime.  (Feb. 2015 Letter ¶ A).  By contrast, Plaintiff alleges that in August 2012, Anoff ordered manager "Katie Redding" (presumably Kathryn Redden) to add Kwashie to the 7:00 a.m. shift, without any formal "bidding" process for the position, which Plaintiff claims violated the CBA.  (Feb. 2015 Letter ¶ H).

As noted above, Markland averred that Kwashie was added to this shift for two main reasons:  resolution of his union grievance, and because it was in the "best business interests of the Hotel to have two house attendants" on the shift.  (Markland Decl. ¶ 22).  While Plaintiff was on FMLA leave in September 2012, though, Kwashie worked the 7:00 a.m. shift alone, which Plaintiff claims proves that Kwashie's addition to the shift was not necessary for any purported business interests.  (Feb. 2015 Letter ¶¶ J, K).  Plaintiff alleges that he met with the union and hotel management, but they "never corrected the situation,"

and the Hotel and Anoff now "ignore[] [his] seniority at the job for work assignments." (Compl. 9-10).

Plaintiff has failed to demonstrate that Kwashie's addition to the 7:00 a.m. shift and the consequent allocation of overtime between the two men constitute an adverse employment action necessary for the first stage of the *McDonnell Douglas* analysis.[11]  Here, there is no dispute that Plaintiff remains an employee of the Hotel, nor that Plaintiff was awarded a position for which he applied and which he finds desirable in terms of overtime earning potential; in fact, Plaintiff stated during his deposition that he received a salary raise in 2015.  (*See* Lee Dep. 43, 161-62).

Furthermore, even if the addition of Kwashie to the 7:00 a.m. shift were deemed to constitute an adverse employment action, Plaintiff has failed to offer any evidence supporting his contention that such action was taken under circumstances suggesting discriminatory intent by Anoff.  As Defendant argues, the Hotel "is permitted to add shifts and control the working hours of its employees." (Def. Br. 13; Welch Decl., Ex. A at 9 (CBA Art. 11(C))). Moreover, Plaintiff conceded at his deposition that if Kwashie had signed up for the 7:00 a.m. position from the beginning, Kwashie would have received the assignment, given that he was the most senior employee in the department. (Lee Dep. 160-61).  Plaintiff further recalled being informed, at that time, that Kwashie was added to the 7:00 a.m. shift due to "business needs."  (*Id.* at 289-

---

[11]     Plaintiff's assertions about his work assignments will be discussed in Section B.2, addressing retaliation, later in this Opinion.

90).  As discussed at length above, Defendant has provided evidence that Kwashie was added to the 7:00 a.m. shift upon the agreement of union representatives and hotel management — above the level of Anoff — for purposes of resolving Kwashie's union grievance.

Plaintiff has similarly failed to rebut Defendant's proffered non-pretextual explanation.  While Plaintiff has challenged the Hotel's assertion that Kwashie's addition was also in "business interests," noting that Kwashie was able to handle the shift alone in Plaintiff's absence, the limited period of that absence simply cannot be indicative of pretext.  On these facts, a reasonable jury would again be required to disregard uncontested evidence and resort to conjecture in order to find that Kwashie was added for reasons stemming from discrimination in favor of Ghanaians or against Plaintiff.

Separately, while "denial of overtime can constitute an adverse employment action," *Mazyck* v. *Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012), an employee nonetheless does not suffer an adverse employment action with regard to overtime opportunities where the employer's overtime records show that the employee worked more overtime hours than his coworkers, *see Lockhart* v. *Hofstra Univ.*, 123 F. App'x 31, 33 (2d Cir. 2005) (summary order).  Further, for denial of overtime to amount to an adverse employment action, there must also be a "material detriment as a result of being denied overtime, such as opportunities for career advancement." *Henry*, 18 F. Supp. 3d at 406.  "[C]onclusory allegation[s] that [a plaintiff] was denied

overtime, without more, [are] insufficient to substantiate an adverse employment action." *Id.*

Here, although Plaintiff claimed in his deposition that Kwashie, due to his seniority, is offered overtime first and "takes everything" (Lee Dep. 163-64), Defendant's records demonstrate precisely the contrary.  In fact, Defendant has proffered evidence showing that Plaintiff received more overtime than Kwashie, and indeed, more overtime from August 2012 through July 1, 2014 — a 24-month period — than any other employee within his department, even considering his two months of FMLA leave in late 2012.  (*See* Welch Decl. ¶¶ 26-30).[12]  Moreover, Defendant notes — and Plaintiff conceded during his deposition — neither hotel policy nor the CBA guarantees any overtime to hotel employees.

In short, Plaintiff has failed to show any "material detriment" to his working conditions as a result of Kwashie's addition to the 7:00 a.m. shift, as Plaintiff has suffered no termination, demotion in wage or salary, reduction of title, material loss of benefits, or significantly reduced material responsibilities. While Plaintiff alleged an adverse action by virtue of his claimed loss of overtime (which the Hotel and union do not actually guarantee), the proffered evidence demonstrates that Plaintiff's overtime earning potential has not suffered.  The Court finds Plaintiff has failed to offer "hard evidence showing

---

[12]     As noted above, Defendant's records demonstrate that Plaintiff received 384.74 hours of overtime from August 2012 to July 2014, the most of any employee in the housekeeping department.  The second-highest recipient of overtime earned 265.47 hours.  Kwashie, the sixth-highest earner of overtime, received 209.97 hours.

that [his] version of events" is accurate, *see Jeffreys*, 426 F.3d at 554, and

thus, this claim fails as well under the *McDonnell Douglas* test.

### 2. Defendant Is Entitled to Summary Judgment on Plaintiff's Failure to Promote Claim, Whether Construed as Employment Discrimination or Retaliation

With regard to his failure to promote claim, Plaintiff contends that in

July 2013, he signed up for certain posted openings, for which he was denied a

transfer.  (Compl. 10).  In Plaintiff's Complaint, this claim is first listed as an

example of discriminatory conduct (*see id.* at 3), but Plaintiff later recasts the

conduct as retaliatory treatment for his complaints about Kwashie's

assignment to the 7:00 a.m. shift (*see id.* at 10).  Accordingly, the Court will

consider Plaintiff's allegation under both frameworks.

Specifically, Plaintiff claims, he attempted to sign up for a posting as a

house attendant on the 30th to 34th floors of the Hotel; however, when

housekeeping director Elvir Dervisevic saw that Plaintiff had signed up,

Dervisevic allegedly removed the posting, added specific hours and days off to

the opening, and reposted it in "violation of the union contract and [the CBA]."

(Feb. 2015 Letter ¶ N).  As Rhesa Welch, Human Resources Manager at the

Westin, stated in her declaration, pursuant to the CBA, the Hotel was

permitted to post "assignment[s] to a particular work duty along with a time

schedule, which are assigned together," and "[s]hifts may also be posted with

specific days off, or may be posted allowing the employee to maintain his or her

current days off, depending on the need of the operation."  (Welch Decl. ¶ 13).

Plaintiff claims, in contrast, that these postings were altered in an attempt to keep Plaintiff from signing up for them. (*Id.*).

Even if the Hotel were not permitted to post assignments with particularized schedules, as Plaintiff alleges, Plaintiff fails to demonstrate an adverse employment action. "A purely lateral transfer is one that does not involve a demotion in form or substance," *Damon* v. *U.P.S.*, No. 04 Civ. 746S (WMS), 2010 WL 4340828, at *7 (W.D.N.Y. Nov. 2, 2010), and while "denial of a transfer may [ ] constitute an adverse employment action, [courts] require a plaintiff to proffer objective indicia of material disadvantage; subjective, personal disappointment is not enough," *Beyer* v. *County of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008) (internal quotation marks and alterations omitted). *Cf. Patrolmen's Benevolent Ass'n of the City of N.Y.* v. *City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) ("A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way.").

According to Welch, "each [posting] represents a different shift assignment for the same position [Plaintiff] currently holds, house attendant, with no change in pay." (Welch Decl. ¶ 17; *see also* Mutawalkil Decl. ¶ 5 (same)). In light of this, Plaintiff has offered nothing more than "subjective, personal disappointment," as the other postings at issue were, for all practical purposes, the same floor attendant position, altered only by their hour assignments and floor assignments. Plaintiff has failed to proffer any evidence

27

that his existing position was "materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to [his] career advancement." *Galabya*, 202 F.3d at 641.[13]  Accordingly, Plaintiff has failed to raise a genuine issue of material fact as to whether these failures to assign Plaintiff to lateral positions constituted adverse employment actions.  And absent an adverse employment action, Plaintiff's claim can be rejected under both the discrimination and retaliation frameworks.

The Court understands Plaintiff to be claiming in his opposition papers that Defendant failed to produce additional listings from prior periods that would have demonstrated that Defendant deviated from its past practice by adding shift times and days off.  (*See* Pl. Opp. 1; *see also* Lee Dep. 116-17).[14] The Court presumes Plaintiff to be requesting additional discovery, which Defendant opposes on the ground that Plaintiff waited until the final day of discovery, after several extensions of fact discovery by the Court, to request any documents, and he failed to seek any additional extension of time for these purpose.  (Def. Reply 8-9).

The Court need not decide whether to reopen discovery, though, as Plaintiff's claim that Defendant violated the CBA by specifying shift times or

---

[13]     Plaintiff flatly stated in his deposition that the requested positions were not managerial. (Lee Dep. 200-01).

[14]     As noted, according to Welch, the Hotel was permitted to specify hours and days off for assignments.  (Welch Decl. ¶ 13).  Mutawalkil further disputed Plaintiff's claim to the contrary, stating he "believed it was important to be absolutely clear about the details of the shifts people in my department would be signing up for.  The shifts had been posted with greater detail in the past, and it was typical practice for the sign-up sheet to state the shift's start- and end-times."  (Mutawalkil Decl. ¶ 9).

28

days off — even if true — is immaterial.  As explained above, Plaintiff sought

lateral transfers to other floor attendant positions, rather than promotions, and

he has failed to proffer any explanation for why those positions were more

prestigious, desirable, or beneficial for career advancement.  Indeed, Plaintiff

expounded in his deposition on the desirability of the 7:00 a.m. floor attendant

position he already held, given its overtime-earning potential.  (*See* Lee

Dep. 161-62).  Absent any indication that the positions sought constituted

materially better jobs, no reasonable juror could conclude that Plaintiff's denial

of a lateral transfer amounted to anything more than "personal

disappointment."

Again, however, even if the Court were to presume that the failure to

assign Plaintiff to these shifts amounts to an adverse employment action,

Plaintiff has nonetheless failed to offer any evidence that this occurred under

circumstances suggesting discrimination *or* retaliation for his complaints about

Kwashie, apart from his entirely conclusory allegations that the postings were

changed to prevent him from signing up.  Moreover, the Hotel has proffered a

legitimate, nondiscriminatory, and non-retaliatory reasons for its action; as

Mutawalkil affirmed, he saw the initial postings and "quickly realized there

would be a problem resulting from the postings' lack of specifics with regard to

the shift start- and end-times."  (Mutawalkil Decl. ¶ 8).  As a result, he

requested that Dervisevic edit and replace the postings in order to "be

absolutely clear about the details of the shifts people in my department would

be signing up for."  (*Id.* at ¶ 9).  In response, Plaintiff has offered no evidence

29

hinting at intentional discrimination or retaliation, much less identifying a genuine issue of material fact in that regard.  Thus, his claim fails under *McDonnell Douglas* as to both discrimination and retaliation.

### 3.   Defendant Is Entitled to Summary Judgment on Plaintiff's Retaliation Claim as to Work Assignments

During his deposition, Plaintiff further testified that, following Kwashie's addition to the 7:00 a.m. shift, Plaintiff's supervisors often overlooked his seniority when work was assigned each day.  (Lee Dep. 218-19, 260).  For instance, Plaintiff stated, Director of Housekeeping Elvir Dervisevic "never once honored" Plaintiff's seniority, giving less senior employees better assignments; Plaintiff "thinks" this was retaliation due to his prior complaints to Human Resources.  (*Id.* at 218-21).  Plaintiff added that at times, managers "Alberto" and "Maria" assigned tasks to Plaintiff that were not designated in his listed duties that day, and that should have been assigned to others.  (*Id.* at 221-24).  Plaintiff also claims that Anoff "retaliated" against him by (i) assigning Plaintiff tasks which required additional help, but declining to assign others to help, or (ii) by assigning Plaintiff tasks while Kwashie was not busy.  (Lee Dep. 294-96).  In the former instance, however, Plaintiff complained to his union delegate about requiring assistance, and Anoff then assigned others to help Plaintiff.  (*Id.*).  In the latter instance, Anoff instructed Plaintiff to mop a certain area, but Plaintiff believed the task should have been assigned to Kwashie.  (*Id.* at 297-98).

Assuming, for purposes of argument, that Plaintiff's complaints about Kwashie's assignment to the 7:00 a.m. shift and Plaintiff's non-assignment to

other posted positions constitute protected activities of which Defendant was aware, Plaintiff nonetheless fails, at the *prima facie* stage, to allege an adverse employment action with regard to his work assignments.  "The receipt of undesirable assignments, without more, amounts to nothing more than a 'mere inconvenience,'" as opposed to "a 'materially adverse change in the terms and conditions of employment.'"  *Henry*, 18 F. Supp. 3d at 406 (quoting *Sanders* v. *N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)).  Such assignments "must be accompanied by a material detriment to an employee's working conditions to constitute an adverse employment action."  *Id.*

With regard to the two examples of undesirable tasks assigned by Anoff, Plaintiff's claims fail to rise above mere inconvenience:  the incident involving assignment of work requiring more than one house attendant was resolved the same day, by addition of a second employee to help Plaintiff, and the instance in which Plaintiff was assigned work while Kwashie appeared not to be busy plainly does not rise to the level of a "material detriment" to Plaintiff's working conditions.  With respect to assignments by supervisors which failed to take seniority into account, Plaintiff only alleges in conclusory fashion that this was retaliatory treatment, failing to offer any evidence to substantiate such claims.  Accordingly, based on the facts presented by Plaintiff, no reasonable jury could determine that these rise to the level of actionable retaliation under Title VII, without resort to speculation and conjecture.  Thus, his claims fall short of the *McDonnell Douglas* standard.

### 4.    Defendant Is Entitled to Summary Judgment on Plaintiff's Remaining Claims of Discriminatory Behavior

Finally, apart from the claims addressed in the preceding two subsections, Plaintiff alleges a number of instances that he believes speak to discriminatory treatment by supervisors.  Plaintiff's Complaint recites that he has been "dealing with managers cursing at [him] with no disciplinary actions [taken] against them."  (Compl. 10).  In his February 26, 2015 letter, Plaintiff also stated that Anoff occasionally made comments, such as asking whether Plaintiff had showered when he "rushed in to work to do overtime," that were unprofessional.  (Feb. 2015 Letter ¶ I).  During his deposition, however, Plaintiff clarified that Anoff's comments were directed at both Plaintiff and other co-workers, rather than solely at him.  (Lee Dep. 166-67).  Further, Plaintiff stated that his allegation about "managers cursing" referred to one incident when manager "Maria" called Plaintiff a "smart ass"; Plaintiff recalled no other instances of Maria making inappropriate comments.  (*Id.* at 222-23).

More generally, Plaintiff testified at his deposition that Defendant failed to abide by its antidiscrimination policies, noting that he had seen harassment and discrimination based on race and national origin at the Hotel.  (Lee Dep. 93-97).  When asked for examples or detail, however, Plaintiff refused to provide any specific instances and attempted to cut off the line of questioning. (*Id.*).  In light of this, the Court can only construe these general remarks as conclusory allegations unsupported by any evidence.

Separately, Plaintiff alleged during his deposition that he heard "rumors" that Anoff favored those of her national origin, but he declined to provide any

specific detail.  (Lee Dep. 189-93).  In addition, Plaintiff appended a document

to his opposition, titled "STAFF MEMBERS OF AFRICAN WITH WESTIN @

TIMES SQUARE NEW YORK BENEFICIALS CONTRIBUTIONS."  (*See* Pl. Opp.).

Plaintiff discussed this document at his deposition, stating that he found it in

the store room closet belonging to Papa Yaw, one of Plaintiff's union

representatives.  (Lee Dep. 124).  When asked its significance, Plaintiff stated,

"I don't know if it's an organization.  I mean, like maybe it's a society or

something.  I don't know."  (*Id.* at 125).  Plaintiff suggested it provided evidence

of "how the Africans … they stick amongst each other, and they do a lot of

stuff."  (*Id.*).  Given the questionable genesis of this document, and the fact that

it has not been authenticated, the Court may not consider it.  *See H. Sand &*

*Co., Inc.* v. *Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (documents

submitted in opposition to summary judgment motion must be presented by

one with personal knowledge, must be authenticated, and must be admissible).

Even if considered, however, the Court cannot identify any significance to this

document and will not accept Plaintiff's rumination of favoritism.

These issues, like those above, do not rise to the level of adverse

employment actions sufficient to support a Title VII claim.  "[N]ormally petty

slights, minor annoyances, and simple lack of good manners" do not constitute

a materially adverse employment actions.  *Burlington Northern & Santa Fe Ry.*

*Co.*, 548 U.S. 53, 68 (2006).  Title VII is not intended to serve as a civility code

for workplaces, but is intended to remedy the harms of discrimination.  *Oncale*

v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *see also Rivera* v.

*Brooklyn Hosp. Med. Ctr.*, 28 F. Supp. 3d 159, 162-63 (E.D.N.Y. 2014) ("an employer may deliberately tolerate an abusive working environment [and] may even create and foster such an environment … unless the employer's purpose … is motivated by prohibited considerations under federal employment law").

The comments Plaintiff references do not rise above this level, and his conjectures regarding favoritism cannot sustain his claims.  During his deposition, Plaintiff testified that while co-workers casually discussed national origin, no one had ever made any sort of negative remarks about Jamaica or Plaintiff being Jamaican.  (Lee Dep. 269-70).  And notably, Anoff made no reference to Plaintiff's national origin, negative or positive.  (*Id.*).  Accordingly, these claims do not satisfy step one of the *McDonnell Douglas* test, and must be dismissed.

At base, Plaintiff claims that he has been discriminated against by Defendant on the basis of his national origin (Jamaican), as a result of his supervisor, Georgina Anoff, showing preferential treatment to a coworker who is also from her country of origin (Ghana).  However, Plaintiff has failed to adduce evidence that Anoff was responsible for any alleged decisions that he now claims were made contrary to his interests.  Nor has Plaintiff produced any evidence of any material detriment to the conditions of his employment as a result of the alleged discrimination.  Even so, should the Court presume an adverse employment action, Plaintiff has not shown that any decision or action occurred under circumstances giving rise to an inference of discrimination.

34

And, finally, Plaintiff has failed to present evidence suggesting that Defendant's proffered non-discriminatory reasons were pretextual.  Accordingly, his claims fall short at each stage of the *McDonnell Douglas* test and must fail.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      June 22, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was mailed by Chambers to:*

George Lee
35 Mariners Lane
Staten Island, NY 10303